## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS KAIRYS, )
)
        Plaintiff, )
)
    v. )   2:19-cv-1031-NR
)
SOUTHERN PINES TRUCKING, INC., )
)
        Defendant. )
)

### OPINION[1]

**J. Nicholas Ranjan, United States District Judge**

On February 7, 2022, the parties in this employment-discrimination case proceeded to a jury trial on several claims, including one for retaliation of the exercise of employee benefits under ERISA. The jury returned a verdict in favor of Defendant Southern Pines Trucking on that claim. But, as the parties agreed before trial, the jury's ERISA verdict was advisory because there is no right to a jury trial for ERISA claims. Thus, the Court is not bound by the advisory verdict. *Hayes v. Cmty. Gen. Osteopathic Hosp.*, 940 F.2d 54, 57 (3d Cir. 1991) ("A trial court has full discretion to accept or reject the findings of an advisory jury.") (citation omitted).

After carefully considering the evidence admitted at trial, the Court respectfully reaches a different conclusion than the jury. The Court finds that Plaintiff Thomas Kairys has proven by a preponderance of the evidence that Southern Pines retaliated against him for exercising his rights to ERISA-protected benefits, and that it interfered with his right to future benefits. As such and for the reasons

---

[1] This Opinion serves as the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). *See* Fed. R. Civ P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

discussed below, the Court awards equitable relief to Mr. Kairys on this claim equal to $67,500 in front pay, plus reasonable attorneys' fees and costs.

## FINDINGS OF FACT[2]

Initially, the Court notes – and the parties agree – that the Court is not bound in any way by the jury's advisory verdict as to the ERISA claim. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 249 (3d Cir. 2013) ("District courts are…free to reject [advisory] verdicts, as long as doing so is not independently erroneous."). Further, while Southern Pines asks this Court to give "due regard" to the advisory verdict, it is difficult to do so because the jury made no specific findings of fact. Instead, "the ultimate responsibility for finding the facts remains with the Court[.]" *Wilson v. Prasse*, 463 F.2d 109, 116 (3d Cir. 1972).

After independently considering the documentary and testimonial evidence admitted at trial, including weighing the credibility of the testimony of the witnesses, the Court finds as follows.

1.      Mr. Kairys served as Southern Pines Trucking's Vice President of Sales from March 14, 2016 until April 23, 2018. Ex. 1; T. Kairys Testimony; 67:15-17. Southern Pines's owner and CEO, Patrick "Pat" Gallagher, personally recruited him for the job.[3] P. Gallagher Testimony, 8:16-25. Mr. Kairys's primary duty was to grow Southern Pines's cryogenic trucking portfolio. *Id.* at 9:3-9; 10:9-11. The vision for his job was long-term, rather than temporary. *See* T. Kairys Testimony, 9:7-24.

---

[2] The Findings of Fact identify certain critical facts, but are not exhaustive. The Court finds and considers other relevant facts, which are described in the "Conclusions of Law & Analysis" section below as they relate to the application of certain legal principles.

[3] Because there are two Gallaghers that testified at trial, the Court does not refer to them by use of any honorific or title. Instead, the Court refers to Patrick Gallagher as "Pat Gallagher" and Robert Gallagher as "Bob Gallagher."

2.      When Mr. Kairys started at Southern Pines, his annual base salary was $125,000.  Ex. 1.  In January 2017, Southern Pines raised his base pay to $140,000.  Ex. 5; Ex. 29.  Mr. Kairys was also eligible for monthly bonuses of up to $3,000 depending on the level of truck utilization he secured.  Ex. 1.  Full utilization earned the maximum bonus.  *Id.*  Mr. Kairys earned several bonuses throughout his tenure at Southern Pines.  *See* Ex. 10; Ex. 15.

3.      In accepting the job with Southern Pines, Mr. Kairys considered health insurance to be an important benefit.  T. Kariys Testimony, 10:18-11-9.  Accordingly, his offer letter from Southern Pines specially provided that his coverage would begin on April 1, 2016 – about 1.5 months earlier than the standard policy for new employees.  Ex. 1.

4.      In October 2016, Mr. Kairys was diagnosed with degenerative arthritis in both hips and learned that he would need to have hip-replacement surgery.  T. Kairys Testimony, 40:19-41:7.  On November 6, 2017, he notified his supervisor – Chad Vittone – about his upcoming procedure.  Ex. 6, SPT 001975.  Mr. Vittone responded that it was "no problem."  *Id.*

5.      Mr. Kairys underwent hip-replacement surgery on November 30, 2017, and he missed some work as a result.  T. Kairys Testimony, 50:24-51:17.

6.      Mr. Kairys's medical expenses, including his surgery, were covered under Southern Pines's employee health insurance plan.  *Id.* at 98:13-16.

7.      Southern Pines's insurance policy was self-insured, meaning that it paid out of pocket for a portion of each claim made on the policy.  P. Gallagher Testimony, 22:24-23:23.  The company periodically received invoices itemizing the cost of medical and pharmaceutical claims for its employees; the invoices showed weekly charges for claims processed by date.  Ex. 7.

8.      Pat Gallagher did not review the weekly invoices himself.  P. Gallagher Testimony, 25:1-12.  But he did review the company's medical costs on an annual

basis.  *Id.* at 54:23-55:1.  The Court draws from this a reasonable inference that Pat Gallagher was generally aware of the expenses incurred by the company under its health plan.

9.      After Mr. Kairys's November 30, 2017, hip surgery, Southern Pines did incur a spike in medical costs.  *See* Ex. 7, SPT002611.  The invoices in Southern Pines's records reflected that Mr. Kairys's costs were highlighted on the spreadsheets, though the spreadsheets had code numbers rather than names.  *Id.*  This suggests to the Court that the costs caught the attention of someone in the company.

10.     Pat Gallagher found out about the hip surgery and became upset.  Mr. Kairys testified that Pat Gallagher was upset about the costs of the surgery, and that his brother – Southern Pines Vice President Bob Gallagher – told him to "lay low." T. Kairys Testimony, 48:4-17; 55:20-56:5.  The Court finds this testimony to be credible.

11.     In or around Summer 2017, Mr. Kairys informed Southern Pines representatives, including Pat Gallagher, that he would eventually need to have both hips replaced.  *Id.* at 55:12-19.

12.     Southern Pines terminated Mr. Kairys on April 23, 2018.   T. Kairys Testimony, 67:15-17.  Pat Gallagher made this decision unilaterally.  P. Gallagher Testimony, 30:1-3.  This occurred right around the end of the benefits calendar year – which was May 1.  P. Vargo Testimony, Trial Transcript III:180.  Mr. Kairys did not receive any advance notice, and his employment ended immediately.  *See* T. Kairys Testimony, 69:20-70:15.    Additionally, during his termination meeting, Southern Pines representatives asked Mr. Kairys to sign a severance agreement that included a release.  *Id.* at 72:8-24.

13.     Pat Gallagher knew that Mr. Kairys's termination might result in legal trouble; he anticipated that Mr. Kairys would hire an attorney.  *See* Ex. 16.  Still, he said "we will not give ground on this."  *Id.*

- 4 -

14.     Kyle Kunkle began working at Southern Pines on June 11, 2018, as part of a hybrid rotation with PGT Trucking.  Ex. 17. Some of his duties overlapped with Mr. Kairys's role.  Ex. 18; T. Kairys Testimony, 22:7-11.

15.     After being fired, Mr. Kairys diligently sought other employment.  T. Kairys Testimony, 75:8-76:5.  But he did not obtain new employment until January 21, 2019.  Ex. 22.  In the meantime, he went on his wife's insurance plan.  Ex. 20; T. Kairys Testimony, 74:16-18.

16.     Mr. Kairys submitted evidence that while his annual base salary at Southern Pines was $140,000, his annual base salary for his current position is $132,500.  Ex. 28, p. 2.  Additionally, Southern Pines allotted a $1,000 monthly car allowance for Mr. Kairys.  *See* Ex. 15.  But his current employer only provides a $500 allowance each month.  Ex. 28, p. 2.  Mr. Kairys also earns smaller bonuses in his new position, though the bonus differential was not quantified with precision.  T. Kairys Testimony, 79:1-4.

17.     Prior to joining Southern Pines, Mr. Kairys held approximately five jobs, spending approximately one to seven years at each one.  *Id.* at 107:6-108:15.

## CONCLUSIONS OF LAW & ANALYSIS

Section 510 of ERISA provides, in relevant part: "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan … or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]"  29 U.S.C. § 1140.

This provision "prohibits employers from discharging or harassing their employees in order to keep them from obtaining employee benefits."  *DiFederico v. Rolm Co.*, 201 F.3d 200, 204 (3d Cir. 2000) (cleaned up).  It also "supports a claim

where an employee alleges that he or she was terminated in retaliation for the past exercise of protected rights" under an employee benefit plan. *Najmola v. Women's Healthcare Grp. of Pa.*, No. 13-6519, 2014 WL 3700260, at *4 (E.D. Pa. July 24, 2014) (cleaned up); *see also Kowalski v. L & F Prod.*, 82 F.3d 1283, 1287 (3d Cir. 1996) ("There is simply no limiting language in § 510 that suggests that only future benefits are protected."). Though ERISA was only one count of his complaint, Mr. Kairys essentially makes both types of claims; he alleges that Southern Pines Trucking "fired him because of the cost of a hip replacement surgery, and to avoid having to pay for a second hip replacement surgery." ECF 125, p. 1.

The parties agreed that to prove ERISA retaliation, Mr. Kairys must show – by a preponderance of the evidence – that there was a causal connection between his termination and his use of the employee benefit plan. ECF 119, p. 18 (final jury instructions); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (citation omitted). "A causal connection may be shown in many ways …. [including] through timing, …antagonism shown toward Mr. Kairys or a change in demeanor toward Mr. Kairys." ECF 119, p. 18 (final jury instructions); *cf. Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Mr. Kairys's ERISA-protected benefits need not have been the sole reason for his termination. *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir. 1997). But they must have been a determinative factor. *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 347 (3d Cir. 1997). "'Determinative factor' means that if not for Mr. Kairys's engagement in the protected activity, the termination would not have occurred." ECF 119, p. 18 (final jury instructions).

On the other hand, to prove interference, Mr. Kairys must show that "(1) the employer committed prohibited conduct (2) that was taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Jakimas v. Hoffman-LaRoche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007)

(cleaned up). Thus, Mr. Kairys must demonstrate that Southern Pines had the specific intent to violate ERISA. *Id.* That is, he must show that Southern Pines "made a conscious decision to interfere with [his]…benefits …. Proof that the termination prevented [him] from accruing additional benefits through more years of service alone is not probative of intent." *Id.* (cleaned up). Again, Mr. Kairys's anticipated use of benefits must have been a determinative factor in his termination. *Turner*, 901 F.3d at 347. But he "need not prove that the intent to interfere was the sole reason for [his termination]." *DiFederico*, 201 F.3d at 206.[4]

In either case, "smoking gun" evidence is often rare. *See Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987). Accordingly, plaintiffs may prove their ERISA discrimination claims through circumstantial evidence. *Id.* In such cases, a finder of fact may employ the *McDonnell Douglas* burden-shifting framework. *Id.* at pp. 852-853. That is, "employees alleging discrimination under ERISA bear the burden of making out a *prima facie* case of discrimination." *Id.* at p. 852. Then, the employer must "rebut the presumption of discrimination" by introducing evidence of "a legitimate, nondiscriminatory reason for its challenged actions." *Id.* at 853. Finally, the plaintiff has "the opportunity to demonstrate that the employer's articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (cleaned up).

In denying summary judgment, this Court already decided that Mr. Kairys presented a *prima facie* case, and that Southern Pines properly articulated a non-discriminatory reason for terminating him. ECF 79, pp. 14-16. The Court finds that the parties met those requirements again at trial. Now, having independently

---

[4] The parties do not dispute that Southern Pines provided employee benefits to its employees, including Mr. Kairys, pursuant to a plan governed by ERISA. *See* ECF 53, pp. 24-25. The main crux of the dispute is whether the termination decision can be causally linked to Mr. Kairys's exercise of rights under the plan.

weighed all the evidence admitted, the Court finds that Mr. Kairys has met his burden to show that Southern Pines's proffered reason was pretextual, and that Mr. Kairys's use – and anticipated future use – of ERISA-protected benefits played a determinative role in his termination.  Because the evidence for the two claims overlaps, the Court will address them simultaneously.

## I.      Southern Pines's explanation for the termination was pretextual.

Southern Pines claimed that Mr. Kairys's position as Vice President of Sales was simply eliminated.  Ex. 19, p. 1.  At trial, it argued that Mr. Kairys's job was intended to be temporary and became unnecessary once the cryogenic fleet was at full utilization.  *See* ECF 119, p. 19.  After reviewing the evidence, the Court finds that this explanation was pretextual for at least six reasons.

First, Southern Pines did not present any evidence that it had told Mr. Kairys he was only a temporary addition and tasked with the completion of a specific objective.  His offer letter does not list a designated term.  *See* Ex. 1.  Mr. Kairys testified that he intended to stay at Southern Pines long-term.  T. Kairys Testimony, 9:7-24.  Given that Pat Gallagher personally recruited Mr. Kairys to join Southern Pines, it is unlikely that the two would have had such a divergent understanding as to the scope of the job.  Additionally, there is no evidence that such a task-based arrangement was standard practice in the industry.

Second, Southern Pines's bonus plan recognized that full utilization was a goal that could fluctuate frequently.  Mr. Kairys's offer letter specifically incentivized full utilization with a $3,000 maximum bonus, and it did not warn him that such an achievement may subject him to termination.  Ex. 1.  Moreover, the letter explained that bonuses are calculated monthly, implicitly recognizing that full utilization was not a permanent state.  *Id.*  Pat Gallagher himself testified that "you might be running at 100 percent this month.  Two drivers quit as drivers, and now you're running at 80 percent."  P. Gallagher Testimony, 31:12-24.  Therefore, it is not

plausible that reaching full utilization any given month would lead Pat Gallagher to decide – that same month – that there would be no more work for Mr. Kairys to do.

Third, Pat Gallagher explained that cryogenic truck drivers such as those who drive for Southern Pines must earn a hazmat endorsement – a more stringent requirement than a traditional commercial driving license. *Id.* at 2:16-25. Pat Gallagher testified that a shortage of hazmat-certified drivers factored into his decision to fire Mr. Kairys. *E.g.*, *id.* at 28:8-19 ("It was becoming more and more difficult to get drivers."); 35:8-14 ("Once again, you can buy equipment. But if you don't have the drivers, it doesn't matter."). His trial testimony was the first time Southern Pines raised this rationale, and Pat Gallagher never mentioned it in his deposition testimony – as Mr. Kairys's counsel pointed out at trial. *See* Ex. 32. On top of that, at trial, Pat Gallagher's testimony on the driver shortage was evasive, and the Court finds it lacking in credibility. *E.g.*, *id.* at 46:3-25 (answering "no" when asked whether "the shortage of drivers [was] one of the factors" considered, and responding "that's an assumption, counselor" when asked whether the driver shortage impacted his decision).

Fourth, Pat Gallagher claimed that he became upset not because Mr. Kairys had surgery, but because, as CEO, he did not know where his employee was. P. Gallagher Testimony, 18:1-10; 19:10-13. The Court does not find this claim to be credible. For starters, Mr. Kairys did not report directly to Pat Gallagher; his immediate supervisor was Chad Vittone. *Id.* at 18:11-19.[5] Pat Gallagher also was not involved in the day-to-day management and operations of Southern Pines. *See id.* at 42:24-43:3. It is therefore unlikely that he would have always expected to know Mr. Kairys's whereabouts. Moreover, Mr. Kairys testified that Bob Gallagher –

---

[5] Pat Gallagher initially testified that Mr. Kairys was a "direct report" to him. *Id.* at 18:5-10. But immediately afterward, in response to direct questioning, he stated the opposite. *Id.* at 18:11-19. This, too, undermines his credibility.

Southern Pines executive and brother of Pat Gallagher – told him that the surgery costs made – or would make – Pat Gallagher mad, and that Mr. Kairys should "lay low." T. Kairys Testimony, 46:22-48:17. Pat and Bob Gallagher claim that these conversations did not occur. *E.g.*, P. Gallagher Testimony, 22:10-17 (Q: "Did you ever tell Bob Gallagher that you were upset about having to pay for [Mr. Kairys's] hip surgery?" A: "No."). After observing each witness's demeanor and comparing their statements with other evidence submitted, the Court finds that Mr. Kairys is more credible on this point.

Fifth, the procedure of this termination was unusual. Pat Gallagher testified that he did not consult anyone prior to making the decision to fire Mr. Kairys. P. Gallagher Testimony, 30:1-9; 59:9-17. In its interrogatory responses, Southern Pines stated that no documents were consulted before deciding to terminate Mr. Kairys, either. Ex. 19, p. 2. As CEO, Pat Gallagher had the authority to terminate employees. P. Gallagher Testimony, 43:16-44:2. But the only other examples he cited where he made a unilateral termination decision were where employees engaged in misconduct or suffered from poor performance. *Id.* at 43:16-23 ("We caught a salesman at PGT who was stealing, falsifying his expense account. We terminated him. Terminated CFOs that weren't being accountable for the department and for their accounting … Today I don't terminate as many people because I don't have that many direct reports.").

Here, there is no claim that Mr. Kairys committed any misconduct or even that he performed inadequately. Quite the opposite. *Id.* at 12:25-13:4 (explaining that Mr. Kairys received a raise because he "was doing what we hired him to do. He was maximizing the amount of equipment we had at Southern Pines"). Indeed, Mr. Kairys earned an $11,458 bonus less than one week before he was fired. Ex. 10. Pat Gallagher stated that terminating an employee is never easy and keeps him up at night. P. Gallagher Testimony, 6:9-15; 43:9-11. Yet, he gave Mr. Kairys no advance

notice and no flexibility to locate another job before his termination became effective – which would have been an obvious accommodation for laying off a highly performing executive for alleged cost-savings reasons. Furthermore, at the termination meeting, Southern Pines representatives asked Mr. Kairys to sign a release. T. Kairys Testimony, 72:8-24.

Sixth, Southern Pines's subsequent staffing decisions undermine its assertion that Mr. Kairys was no longer needed. Less than two months after firing Mr. Kairys, Southern Pines borrowed a new employee, Kyle Kunkle, from a sister company, PGT Trucking. Ex. 17. Mr. Kunkle joined Southern Pines on a "hybrid rotation" basis. *Id.* Mr. Kunkle was meant to learn the operations of the business so that he could become a better salesman. P. Gallagher Testimony, 38:13-20. Pat Gallagher explained that "to be a salesman… you have to go through operations. Because if you don't understand how it works, you can't sell." *Id.* at 37:25-38:5. Under this logic, Mr. Kairys would have already been well-versed in Southern Pines's operations during his tenure. Indeed, Mr. Kairys testified that his work frequently involved operations. T. Kairys Testimony, 21:6-22:11 (examining ex. 18).[6] Yet, Pat Gallagher refused to apply his own logic in this case; he stated that he did not keep Mr. Kairys on to do this operations work because "Mr. Kairy [sic] was sales, for the most part." P. Gallagher Testimony, 38:21-24. And on cross examination, he was evasive about the sales-operations connection he himself had explained. *Id.* at 57:3-11 ("I think [Mr. Kairys] probably knew operations, but that wasn't the role he was in. He was in sales.").

Though his title differed, Mr. Kunkle ultimately performed some of the same tasks Mr. Kairys had done, including some operations work, as well as "sales maintenance" such as attending sporting events with clients. *Id.* at 55:2-56:10. In

---

[6] Given the small size of Southern Pines's office, the Court finds it credible that the duties of the three employees would occasionally overlap.

some respects, moreover, Mr. Kunkle was there so that the company "would at least have a warm body over there to answer the phone." *Id.* at 57:19-24.  Thus, Southern Pines clearly needed a third employee to function.  Pat Gallagher indicated that he preferred to save money because 'we didn't need the $150,000 salesperson at that time.'  *Id.* at 51:3-8.  Notably, however, Pat Gallagher avoided answering a juror question – posed by the Court – asking why he did not consider offering Mr. Kairys a different position at Southern Pines or a pay cut to keep his position.  *See id.* at 72:8-16.

Based on these ample inconsistencies, the Court finds it reasonable to infer that Southern Pines's stated reason for firing Mr. Kairys was not its true reason and was instead a pretext for unlawful discrimination.

## II.    The preponderance of the evidence demonstrates that the exercise of Mr. Kairys's ERISA-protected benefits was the real determinative reason behind his termination.

When coupled with the pretextual nature of Southern Pines's proffered reason, as discussed above, the following evidence leads the Court to find that the pretext provided was intended to disguise discrimination because of Mr. Kairys's use – and anticipated future use – of his ERISA-protected health benefits.

To start, Pat Gallagher explained that twenty years ago, Southern Pines chose a self-insured health plan specifically to "keep our cost down."  P. Gallagher Testimony, 23:18-23.  He admitted that "20 years ago I did [question health costs], yeah.  Because I didn't know how I was paying for it…you're trying to negotiate to keep your medical costs down." *Id.* at 23:24-24:7.  Twenty years later, although Pat Gallagher's companies are now much larger, their health plan remains self-insured. *Id.* at 22:24-23:2; 23:22-23.  Therefore, even if the company has more funds, the incentive to "keep costs down" remains strong.

To that end, Pat Gallagher demonstrated awareness that the age and health status of employees would affect the company's health insurance rates. Under Southern Pines's plan, "you accumulate how many claims you have …. And based on the age of your employees, they give you a number." *Id.* at 23:24-24:7. He understood that age factors in because "when you're 56 years old," the average age of his employees, "you're going to have some medical issues." *Id.* at 27:17-20. But again, on cross, Pat Gallagher was evasive on these topics. *E.g.*, *id.* at 53:14-54:12 (Q: "But at an earlier time you had testified that the insurance rates were based on the employee's age and number of claims; correct?" A: "I don't recall that." Q: "Is it true?" A: "I don't know." … "No. I didn't say I didn't know."); *id.* at 62:20-63:9 (Q: "Who is more likely to need a more expensive medical procedure, a person in their 50s or a person in their 20s?" A: "I'm not an expert in the field.").

At trial, Southern Pines argued that a general awareness of costs could not lead to individualized discrimination because Pat Gallagher would not have been able to discern which costs came from Mr. Kairys. *E.g.*, *id.* at 22:21-23. After all, his various companies have hundreds of employees in total. *Id.* at 4:6-13; 71:14-17. Additionally, Pat Gallagher claimed that he never discussed the cost of Mr. Kairys's surgery with Bob Gallagher or did any investigation to find out the cost. *Id.* at 20:13-20. The Court does not find this testimony to be credible.

As shown at trial, Southern Pines kept health insurance invoices with a single line highlighted on each page – "SP01." Ex. 7. The invoices show weekly expenses for Pat Gallagher's employees enrolled in the UPMC health plan. *Id.* It would not have been difficult to discover that "SP01" was the line item for Mr. Kairys. Only 20 employees utilized this plan. *Id.* And though the employees were "anonymized" with codes instead of names, the codes began with "P," "S," or "SP." Common sense leads the Court to infer that the codes correspond with Pat Gallagher's three companies: "PGT," "Sudbury," and "Southern Pines," respectively. *Id.* There were only three

total employees at Southern Pines.  *See* P. Gallagher Testimony, 16:1-3.  Plus, Southern Pines officials were aware that Mr. Kairys had surgery, which would appear on an invoice as a larger medical expense than usual.  Indeed, claims paid the week of December 10-16, 2017 – shortly after Mr. Kairys's surgery – amounted to $23,277.07.  Ex. 7, p. 13, SPT002611.  Of these, $13,394.94 corresponded to "SP01."  Therefore, it would not have been difficult to identify "SP01" as Mr. Kairys and parse his expenses.  Someone at Southern Pines highlighting the "SP01" charges on each invoice suggests that Southern Pines did exactly that.

Finally, Paul Vargo – who oversaw risk management for both Southern Pines and PGT Trucking – testified that the "[health] plan year runs from May 1st to May 1st."  P. Vargo Testimony, Trial Transcript III:180.  Mr. Kairys was terminated on April 23, 2018.  T. Kairys Testimony, 67:15-17.  Even if Pat Gallagher did not review health insurance invoices week-to-week, he did examine healthcare costs on an annual basis.  P. Gallagher Testimony, 24:11-13 ("[Mr. Vargo and I] look at the numbers, and then I sign off on it."); *id.* at 54:23-55:1 (Q: "[D]o you become aware on an annual basis of the amount of employee health care expenses?"  A: "Yes.  As CEO, that's my responsibility.  It's a cost.").  From this timeline, the Court draws the reasonable inference that Pat Gallagher and Mr. Vargo would have reviewed medical costs near the end of the benefit year as an annual summation.  Around that same time, Southern Pines chose to fire Mr. Kairys.  Though this occurred nearly five months after the surgery itself, the termination's close proximity to the annual cost review period is evidence of a causal connection.  Pat Gallagher's anger – a change in demeanor toward Mr. Kairys – strengthens this inference, especially because of his demonstrated priority of saving on costs.

Similarly, terminating Mr. Kairys shortly before a new benefit year started also suggests a specific intent to prevent him from costing the company money again.  Mr. Kairys had long known that both hips needed replacement.  *See* T. Kairys

Testimony, 46:11-15. Pat Gallagher also knew that Mr. Kairys would need a second surgery because Mr. Kairys testified that he had informed him of that fact at a meeting. *Id.* at 55:12-19. Tellingly, Pat Gallagher was evasive on the subject. *Compare* P. Gallagher Testimony, 21:13-15 (Q: "Were you ever aware that Mr. Kairys might have to have a second hip surgery?" A: "No.") *with id.* at 21:16-24 (immediately backtracking: "I'm just vaguely remembering if Bob Gallagher mentioned it walking past in the hall."). He also knew that investigating an employee's health care costs is illegal. *Id.* at 22:21-23. Pat Gallagher even expected to hear from a lawyer after firing Mr. Kairys. *See* Ex. 16. Southern Pines's attempt to secure a release from Mr. Kairys upon his termination also indicates consciousness of liability for wrongdoing. Especially when coupled with the evidence of pretext discussed above, this evidence permits the Court to infer and specifically find a specific intent to interfere with Mr. Kairys's benefits. *DiFederico*, 201 F. 3d at 207 ("If the plaintiff proves that [his] employer's proffered reason was pretext, the court may infer that the employer was in fact motivated by the specific intent to interfere with the attainment of benefits.").

Taken together, the preponderance of the evidence ultimately shows retaliation for use of benefits, and/or specific intent to prevent future use of benefits.

## III.    The Court awards Mr. Kairys equitable front pay and reasonable attorneys' fees and costs.

Under Section 502(a)(3) of ERISA – the enforcement mechanism for Section 510 violations – successful plaintiffs may "enjoin any act or practice which violates…the terms of the plan, or [] to obtain other appropriate equitable relief to (i) redress such violations or (ii) to enforce any provisions of…the terms of the plan." 29 U.S.C. § 1132(a)(3). The Supreme Court has explained that "equitable relief must mean *something* less than *all* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 n.8 (1993) (emphasis in original). Instead, it refers to "those categories of relief that were *typically* available in equity[] in the days of the divided bench." *Eichorn v. AT&T*

*Corp.*, 484 F.3d 644, 654 (3d Cir. 2007) (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002)).   Therefore, compensatory damages are not available.   *Mertens*, 508 U.S. at 255.   The Third Circuit excludes back pay as well. *Eichorn*, 484 F.3d at 656 ("The remedy they seek is thus akin to 'back pay,' which is not an equitable remedy within the meaning of the statute." (citing *Great-West*, 534 U.S. at 218 n.4)).   But monetary relief is still available in "limited circumstances."  *Id.* at 655 n.6 ("This is not to say that an ERISA plaintiff's demand for money necessarily requires the conclusion that the relief sought is not 'equitable' within the meaning of the statute.").   Indeed, "whether the remedy a plaintiff seeks is legal or equitable depends on (1) the basis for the plaintiff's claim and (2) the nature of the underlying remedies sought."  *Montanile v. Bd. Of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (cleaned up).   This is "largely dependent on the facts of a particular case and cannot be assessed in [a] sweeping [] fashion."  *Sessions v. Owens-Illinois, Inc.* No. 07-1669, 2008 WL 4821755, at *6 n.10 (M.D. Pa. Nov. 4, 2008).

Reinstatement is the typical remedy for an ERISA Section 510 violation. *Eichorn*, 484 F.3d at 658.   It is "indisputably an equitable remedy."  *Schwartz v. Gregori*, 45 F.3d 1017, 1023 (6th Cir. 1995).   But it is not always feasible or appropriate.  *Id.*   For example, there may be a high likelihood of continuing hostility between the parties, or the position may no longer be available.  *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009).   It may also be unduly difficult for the Court to police an ongoing relationship between the parties.  *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984).   "Guided by the particular circumstances of a case, the district court has broad discretion in determining whether reinstatement is appropriate[.]"  *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 832 (3d Cir. 1994) (citation omitted).

In this case, the Court finds that reinstatement is not a viable option.   The

course of this litigation has shown – and engendered – strong animosity between the parties.[7]   This animosity would be difficult to avoid or overcome, given Southern Pines's small staff.  The contentiousness and frequency of disputes also persuade the Court that policing an ongoing relationship would require frequent, burdensome intervention.  Finally, there is currently no open position at Southern Pines.  P. Gallagher Testimony, 33:20-23.  Because the preferred remedy of reinstatement is not available, the Court will instead award front pay.

When reinstatement is not workable, ERISA Section 510's purpose would be thwarted if front pay were not available as an alternate remedy.  *Cf. Maxfield v. Sinclair Int'l*, 766 F.2d 788, 796 (3d Cir. 1985) (citation omitted).  "The principal object of ERISA is to protect plan participants and beneficiaries."  *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (cleaned up).  And, as the Third Circuit has explained, "Congress enacted § 510 primarily to prevent employers from discharging or harassing their employees in order to keep them from obtaining ERISA-protected benefits."  *Kowalski*, 82 F.3d at 1287 (citation omitted).  This applies to past benefit recipients as well; otherwise, "employers would be free to pay ERISA benefits to an employee and then discharge the employee for having exercised his or her right to the benefits."  *Kowalski*, 82 F.3d at 1288.  Foreclosing front pay as a substitute for reinstatement would mean that "the most egregious offenders could be subject to the least sanctions."  *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 853 (2001).  That is, employers who create a hostile environment or cause psychological injuries to the plaintiff would be able to avoid liability and continue their unlawful behavior.  *See id.*  This result squarely conflicts with the purposes of Section 510.

---

[7] For example, Mr. Kairys and his wife both testified that Southern Pines caused him mental anguish to the point of depression.  *See* T. Kairys Testimony, 83:7-84:5; 87:22-88:8.  For its part, Southern Pines immediately declared that it "[would] not give ground on this" and refused to pay Mr. Kairys severance pay for nearly four years, as discussed above.  Ex. 16.

In other statutory contexts, the Third Circuit has held that front pay is an acceptable substitute when reinstatement is not appropriate. *E.g.*, *Feldman*, 43 F.3d at 831 (Section 1983); *Donlin*, 581 F.3d at 86 (Title VII); *Maxfield* 766 F.2d at 797 (ADEA). And though it has not addressed front pay in ERISA cases, other courts have permitted such an award. *E.g.*, *Schwartz*, 45 F.3d at 1023. In light of this close association with reinstatement, and considering Section 510's similarity to other antidiscrimination statutes, the Court finds that awarding front pay is appropriate here.

Front pay is a forward-looking remedy. At bottom, its purpose is to allow a victim of discrimination to "reestablish [his] rightful place in the job market."[8] *Goss* 747 F.2d at 889. The Court must exercise its discretion in selecting a cut-off date that represents "a reasonable future period" to achieve this goal. *Donlin*, 581 F.3d at 87 (citing *Goss*, 747 F.2d at 889). When calculating an appropriate front-pay award, courts consider a variety of factors. These include "an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy…the plaintiff's age, length of employment, likelihood that [he] would have remained in [his] position," among other pertinent factors. *Hosler v. Jay Fulkroad & Sons*, No. 13-1153, 2015 WL 3865877, at *13 (M.D. Pa. June 23, 2015) (cleaned up).

Here, Mr. Kairys's mitigation efforts are not in dispute. He testified that over the nine months he was unemployed, he participated in networking and job boards, reached out to industry contacts, and applied to hundreds of jobs. T. Kairys Testimony, 75:8-76:5. Based on the specialized nature of the cryogenic trucking industry, the Court can reasonably conclude that comparable employment

---

[8] This differentiates it from back pay, which aims to compensate plaintiffs for *past* losses rather than *future* losses. *See Eichorn*, 484 F.3d at 657. Here, the Court is not requiring Southern Pines to pay the lost wages Mr. Kairys would have been due under his contract. *Compare Great-West*, 534 U.S. at 714.

opportunities would be few and far between.  Mr. Kairys's age – 55 – may limit his hiring prospects further.  *See* T. Kairys Testimony, 2:7-8.  Mr. Kairys had been at Southern Pines for over two years, and he expressed a desire to remain there.  *Id.* at 8:24-9:24.  Each of these factors weighs toward a longer front pay period.

Ultimately, the Court finds it most appropriate to determine a front pay period by analogizing it as closely as possible to reinstatement – the preferred remedy this award seeks to approximate.  That is, the Court will estimate how long Mr. Kairys would remain in his position if the limitations discussed above did not exist, and he were reinstated at Southern Pines immediately.  Mr. Kairys testified that he hoped to stay at Southern Pines until retirement.  T. Kairys Testimony, 114:19-23.  But front pay is not meant to "guarantee every claimant…an annuity to age 70." *Anastasio v. Schering Corp.*, 838 F.2d 701, 709 (3d Cir. 1988).  Therefore, the Court cannot rely on Mr. Kairys's stated hopes alone.

Mr. Kairys has been in sales for over twenty years.  T. Kairys Testimony, 106:23-107:1.  Before joining Southern Pines, Mr. Kairys held approximately five jobs, spending approximately one to seven years at each one.  *Id.* at 107:6-108:15.  Based on this track record and the nature of the industry, balanced against Mr. Kairys's advancing years and expressed desire for stability, the Court finds that five years of front pay is an appropriate period.

As to amount, there are multiple ways the Court could calculate a reasonable rate for front pay.  First, focusing squarely on the defendant's gain, the Court could award Mr. Kairys the amount that Southern Pines would have had to pay for his second hip surgery – money that the company saved by ensuring he could not exercise his health benefits a second time.  The Court could then add the difference between Mr. Kairys's annual salary and Kyle Kunkle's annual compensation for his work at Southern Pines – money the company saved by utilizing a younger worker who was

less likely to incur health expenses.[9]  Alternatively, the Court could award Mr. Kairys the difference between his compensation at Southern Pines and what he is earning now at his new position.  Based on the record introduced at trial, the latter option is more appropriate; it is designed to help Mr. Kairys re-establish himself in a cryogenic trucking sales position, eliminate the need for additional accounting and expert testimony, and avoid overcharging Southern Pines.

Mr. Kairys submitted evidence that while his base salary at Southern Pines was $140,000 per year, his base salary for his current position is $132,500 per year. Ex. 28, p. 2.  So, despite his additional years of experience, he still earns $7,500 less per year.[10]  Additionally, Southern Pines allotted a $1,000 monthly car allowance for Mr. Kairys.  *See* ex. 15.  But his current employer only provides a $500 allowance each month.  Ex. 28, p. 2.  That is a difference of $6,000 per year.

Upon his termination in 2018, Mr. Kairys had already earned $16,337 in bonuses that year.  Ex. 15.  At his new job, on the other hand, Mr. Kairys's bonuses are smaller and less frequent.  T. Kairys Testimony, 79:1-7.  However, the Court finds that factoring bonuses into front pay would be inappropriately speculative here.  For one thing, there is little evidence regarding the details of the Southern Pines bonus plan in place when Mr. Kairys was fired.  *See* ex. 14; P. Gallagher Testimony, 16:1-17.  Moreover, Southern Pines changed its bonus plan after Mr. Kairys's termination. P. Gallagher Testimony, 16:18-22.  And the new plan differs significantly from the old model.  *See id.* at 16:25-17:3.  Even with more information, though, the Court

---

[9] Even if Southern Pines really did intend to scale back its sales activities and would have cut Mr. Kairys's compensation accordingly, this wage difference likely would still be substantial, given the difference in age and experience between Mr. Kairys and Mr. Kunkle.

[10] It would not be proper for the Court to speculate as to whether, when, and how much Mr. Kairys's pay may have increased had he stayed at Southern Pines.  *See Donlin*, 581 F.3d at 81-82.  So, the Court will adopt the $7,500 wage differential.

finds that making projected bonus calculations would be too speculative. This is because in sales, compensation depends not only on the salesperson's ability, but also on economic factors that affect entire industries. *Goss*, 747 F.2d at 890.[11]

Therefore, the Court will set front pay at a rate of $13,500 per year – which is the annualized wage and car allowance differential. Considering a five-year period, this results in a total of $67,500 in front pay.

Finally, the Court finds that an award of reasonable attorney's fees and costs is appropriate under 29 U.S.C. § 1132(g). Under *Ursic v. Bethlehem Mines*, a Court must consider five factors in determining eligibility. 719 F.2d 670, 673 (3d Cir. 1992). These factors are: "(1) the offending part[y]'s culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorney's fees; (3) the deterrent effect of an award of attorney's fees; (4) the benefit conferred upon members of the pension plan as a whole; and (5) the relative merits of the parties' positions." *Templin v. Indep. Blue Cross*, 785 F.3d 861, 867 (3d Cir. 2015). Here, the factors weigh in favor of awarding attorneys' fees for several reasons.

First, a party is culpable if it is at fault, even if there was no malice or guilty purpose. *McPherson v. Emps. Pension Plan of Am. Re-Ins. Co. Inc.*, 33 F.3d 253, 257 (3d Cir. 1994). As discussed above, Southern Pines is culpable because it retaliated against Mr. Kairys for using his health benefits and interfered specifically to prevent him from using additional benefits. This is not simply a denial-of-benefits case under ERISA. It is a case of intentional retaliation, which brings with it more culpability.

Second, though Pat Gallagher testified that Southern Pines carries debt, he equated the debt to a car payment and did not suggest financial insolvency or inability to pay. P. Gallagher Testimony, 73:1-6; 75:7-22. Indeed, based on the

---

[11]   There was some testimony at trial regarding increased health-benefit costs incurred by Mr. Kairys since his termination. The Court finds that there is insufficient precision with that evidence to factor it into any front pay award.

overall testimony at trial as to the operations of Southern Pines, the business was presented as profitable with ongoing operations and significant assets.

Third, an award of attorney's fees in this case is important to deter further wrongdoing by Southern Pines, especially because traditional remedies like compensatory and punitive damages are unavailable. Southern Pines demonstrated its cost-averseness, and the award of fees will chill future temptations to interfere with ERISA benefits to save money.

Fourth, regarding "the benefit conferred upon members of the pension plan as a whole," the Court finds that this factor is largely duplicative of the deterrence factor above, and is otherwise inapplicable or neutral here. *See Hamilton v. Bank of New York (Delaware)*, No. CIV.A. 94-436 MMS, 1995 WL 447659, at *6 (D. Del. July 18, 1995) ("The Court agrees that an award of fees in this case will not greatly benefit the Plan members as a whole. The settlement did not effect a change in Plan administration or policy that impacts anyone other than the plaintiff. Plaintiff asserts that the Plan will provide more information to future claimants; this, however, is the same as the deterrence argument, i.e., that an award will deter certain conduct of the defendants, and does nothing to confer a positive immediate benefit on other Plan members.").

Fifth, the Court finds that Southern Pines's version of events was pretextual, meaning that the merits of its case are weak at best. Even if the other factors Southern Pines argued played some role in Mr. Kairys's termination, the company still fired him because of his health benefits. The Court acknowledges that the jury, in effect, viewed the evidence (and likely the witnesses' credibility) in a different manner in reaching its advisory verdict in favor of Southern Pines. But the Court need not give that advisory verdict any deference. In the Court's independent review of the evidence and witness testimony, the merits of Southern Pines's basis for the termination are weak.

- 22 -

Accordingly, based on these factors, the Court will order an award of reasonable attorneys' fees and costs, with the amount to be determined upon submission of a post-judgment fee petition.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court grants judgment in favor of Mr. Kairys as to Count III of the Second Amended Complaint and awards him equitable relief of $67,500, and any associated reasonable attorneys' fees and costs.

DATE: March 31, 2022                          BY THE COURT:

                                              /s/ *J. Nicholas Ranjan*
                                              United States District Judge